**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:15-cv-01946-CCB |
| OHM CONCESSIONS GROUP, LLC d/b/a DUNKIN' DONUTS, | ) | |
| Defendant. | ) | |

# CONSENT DECREE

This action was instituted by Plaintiff, the Equal Employment Opportunity Commission (the "EEOC" or the "Commission"), against Defendant, OHM Concessions Group, LLC d/b/a Dunkin' Donuts ("Defendant" or "OHM"), alleging that Defendant violated Sections 102(a) and (b) of Title I of the Americans with Disabilities Act ("the ADA") of 1990, as amended through the ADA Amendments of 2008, 42 U.S.C. § 12112(a) and (b), and Title I of the Civil Rights Act of 1991, by failing to provide Charging Party Joan McMahon O'Donnell a reasonable accommodation for her disability and discharging O'Donnell because of her disability. Defendant denies the allegations in the Complaint.

The parties desire to resolve this action without the time and expense of continued litigation, and they desire to formulate a plan, to be embodied in a Decree, which will promote and effectuate the purposes of the ADA.

The Court has examined this Decree and finds that it is reasonable and just and in accordance with the Federal Rules of Civil Procedure and the ADA. Therefore, upon due consideration of the pleadings and the record as a whole, it is ORDERED, ADJUDGED AND

DECREED:

**Scope of Decree**

1. This Decree resolves all issues and claims in the Complaint filed by the Commission in this ADA action, which emanate from the Charge of Discrimination filed by Joan McMahon O'Donnell. This Decree in no way affects the Commission's right to process any other pending or future charges that may be filed against Defendant and to commence civil actions on any such pending or future charges as the Commission sees fit.

2. This Decree shall be in effect for a period of two (2) years from the date it is entered by the Court. During that time, this Court shall retain jurisdiction over this matter and the parties for purposes of enforcing compliance with the Decree, including issuing such orders as may be required to effectuate the purposes of the Decree.

3. Except as otherwise specified in this Decree, the terms of this Decree apply to all of Defendant's facilities.

4. This Decree, being entered with the consent of Plaintiff and Defendant, shall not constitute an adjudication or finding on the merits of the case.

**Relief to Joan McMahon O'Donnell**

5. Defendant shall pay Joan McMahon O'Donnell monetary relief in the total amount of $151,000.00, representing $74,724 in back pay with interest, $1,552.00 in pecuniary damages, and $74,724 in nonpecuniary compensatory and punitive damages. Defendant will issue O'Donnell IRS Form 1099s for the 2015 and 2016 tax years for the non-pecuniary damages amount and IRS W2 forms for the 2015 and 2016 tax years for the back pay amount. Defendant shall make all legally required withholdings from the back pay amount. The checks and IRS forms will be sent directly to O'Donnell, and a photocopy of the checks and related correspondence will be mailed to the EEOC, Baltimore Field Office, 10 S. Howard Street, 3rd

Floor, Baltimore, Maryland 21201 (Attention: Trial Attorney Amber Trzinski Fox).

6. Defendant shall make two payments as set forth in this Paragraph 6. Within thirty (30) business days of entry of this Decree, Defendant shall make the first payment of $76,276.00 ($37,362.00 as backpay, $1,552.00 as pecuniary, and $37,362.00 as non-pecuniary) to O'Donnell in the manner set forth above. Defendant shall make every effort to make this first payment to O'Donnell prior to December 31, 2015. Within ninety (90) business days of entry of this Decree, Defendant shall make the second payment of $74,724.00 ($37,362.00 as backpay and $37,362.00 as non-pecuniary) to O'Donnell in the manner set forth above.

7. If Defendant fails to make any payment of monetary relief in full accordance with the payment schedule set forth above in Paragraphs 5-6, then the principal sum of the unpaid balance shall become immediately due and payable.

8. Defendant shall provide O'Donnell, within ten days of the entry of this Decree, with a neutral letter of reference, on OHM letterhead, and signed by Milan Patel, setting forth, at a minimum, the following: O'Donnell's dates of employment, position, and work location. In response to any inquiry received by OHM concerning O'Donnell from a potential employer, headhunter, or other person inquiring about O'Donnell's employment history, Defendant shall provide a neutral reference concerning O'Donnell, indicating the following: O'Donnell's dates of employment, position, and work location.

**Injunctive Relief**

9. Defendant, its officers, agents, servants, employees, and all persons acting or claiming to act in their behalf and interest hereby are enjoined from denying reasonable accommodations to qualified individuals with disabilities and violating the provisions of the ADA, and related regulations, including the following provisions:

No covered entity shall discriminate against a qualified individual on the basis of

> disability in regard to ... discharge of employees .... and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

> [T]he term `discriminate against a qualified individual on the basis of disability' includes ... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ....

42 .S.C. § 12112(b)(5).

**Written Policies & Procedures**

10. Within sixty (60) days from the entry of this Decree, Defendant will implement and disseminate to all employees and new hires a revised Attendance Policy. The revised policy will include a procedure for invoking a request for a reasonable accommodation under the ADA and will state that Defendant will make exceptions to the policy when required by the ADA as a reasonable accommodation for employees with disabilities. Defendant will also revise related employee policies to reflect the revisions in the Attendance Policy.

**ADA Training**

11. Within five months from the entry of this Decree, Defendant shall provide at least two hours of live training on the ADA for all supervisory and managerial employees and all human resources personnel. The training will cover all areas of prohibited ADA employment discrimination, with a special emphasis on reasonable accommodation and the duty to engage in an interactive process. The training will also specifically address the provision of unpaid leave as a reasonable accommodation and exceptions to Defendant's Attendance Policy discussed in Paragraph 10 above. The training shall be conducted by Brian C. Hey and Christine S. Coleman of the law firm McMahon Berger, P.C.

12. In year two of the Decree, Defendant shall provide an annual training consisting of one hour of live training or training in DVD/Video format with a quiz for all supervisory and

managerial employees and human resources personnel.

13. Within ten business days of completing its two hour live training as discussed in Paragraph 11 above, Defendant will provide the EEOC with written documentation that the training occurred, including the date the training was completed, and a signed attendance list identifying the name and job title for all attendees. In year two of the Decree, Defendant will provide the written documentation that the training occurred, including the signed attendance list, with its next due quarterly report.

14. During orientation, all new employees shall be informed of Defendant's policies regarding the ADA and reasonable accommodation.

**Notice and Postings**

15. Within thirty (30) business days of entry of this Decree, Defendant will post and cause to remain posted the posters required to be displayed in the workplace by Commission Regulations, 29 C.F.R. § 1601.30, in all places where notices to employees customarily are posted.

16. Within thirty (30) business days of entry of this Decree, Defendant will post in all places where notices to employees customarily are posted at its facilities the Notice attached hereto as Exhibit A ("Notice to Employees"). This Exhibit shall be posted and maintained for the duration of the Decree and shall be signed by a representative of Defendant with the date of actual posting shown thereon. Should the Exhibit become defaced, marred, or otherwise made unreadable, Defendant will ensure that new readable copies of the Exhibit are posted in the same manner as specified above. With its next report to the EEOC, Defendant shall forward to the Commission's Baltimore Field Office a copy of the signed Notice (Exhibit A) and written certification that the Notice (Exhibit A) has been posted and a statement of the location(s) and date of posting.

**Monitoring Provisions**

17. On a quarterly basis, Defendant will prepare and submit to the Commission a list of all individuals in Defendant's facilities who have complained of (internally or externally) or reported any discrimination in employment on the basis of disability during that quarter. This list will include each individual's name; home address; home telephone number; nature of the individual's complaint; name of individual who received the complaint or report; date complaint or report was received; description of Defendant's actions taken in response to the complaint or report, including the name of each manager or supervisor involved in those actions. If no individuals have complained of or reported any discrimination in employment on the basis of disability during that quarter, Defendant will so inform the Commission's Baltimore Field Office.

18. In addition to the monitoring provisions set forth elsewhere in this Decree, EEOC may monitor compliance during the duration of this Decree by inspection of Defendant's premises, records, and interviews with employees at reasonable times. Upon fourteen (14) days' notice by the EEOC, Defendant will make available for inspection and copying any records requested by EEOC, facilities sought to be inspected by EEOC, and employees sought to be interviewed by EEOC.

19. All materials required by this Decree to be sent to the EEOC shall be addressed to: Amber Trzinski Fox, Trial Attorney, Equal Employment Opportunity Commission, Baltimore Field Office. The materials shall be sent by electronic mail to amber.fox@eeoc.gov.

20. The Commission and Defendant shall bear their own costs and attorneys' fees.

21. The undersigned counsel of record in the above-captioned action hereby consent, on behalf of their respective clients, to the entry of the foregoing Consent Decree.

22. Subject to the Court's retention of jurisdiction for the purpose of ensuring compliance with this Decree, this Action is hereby dismissed with prejudice against Defendant.

Respectfully submitted,

FOR PLAINTIFF:

*/s/ Debra M. Lawrence*
Debra M. Lawrence
Regional Attorney

*/s/ Maria Salacuse*
Maria Salacuse
Supervisory Trial Attorney

*/s/ Amber Trzinski Fox*
Amber Trzinski Fox
Trial Attorney
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Baltimore Field Office
10 S. Howard Street, 3rd Floor
Baltimore, MD 21201
Phone: (410) 209-2763
Email: amber.fox@eeoc.gov

*Counsel for Plaintiff Equal Employment Opportunity Commission*

Respectfully submitted,

FOR DEFENDANT:

*/s/ Brian C. Hey*
Brian C. Hey
(with permission)
Christine S. Coleman
McMahon Berger, P.C.
2730 North Ballas Road, Ste. 200
St. Louis, MO 63131
Phone: (314) 567-7350
Email: hey@mcmahonberger.com
Email: coleman@ mcmahonberger.com

*/s/ Darryl G. McCallum*
Darryl G. McCallum
(with permission)
Shawe Rosenthal LLP
One South Street, Suite 1800
Baltimore, Maryland 21202
Phone: (410) 752-1040
Email: mccallum@shawe.com

*Counsel for Defendant OHM Concessions Group, LLC d/b/a Dunkin' Donuts*

**SO ORDERED.**

Signed and entered this ___ day of _______________, 2015.

_______________________________
Catherine C. Blake
United States District Judge

THE LAW OFFICE OF GERALD L. GILLIARD, ESQ., LLC

1629 k Street, NW, Suite 300
washington, dc 20006
Ph.: 202-827-9753
FAX: 202-478-1783
Email: ggilliard@employmentlegalteam.com
Website: www.employmentlegalteam.com

January 15, 2018

**VIA U.S. MAIL**
Mr. Evangelos Spiros "Spike" Mendelsohn, Owner
Good Stuff Eatery
303 Pennsylvania Avenue, S.E.
Washington, D.C. 20003
Tel.: (202) 543-8222

**RE: Harassment and Termination of Mr. George Curtis**
**Offer of Compromise**

Mr. Mendelsohn:

This law firm represents Mr. George Curtis ("Mr. Curtis") regarding his former employment with OHM Concession Group, LLC ("OHM"), the operator of the Good Stuff Eatery restaurant at Reagan National Airport.[1] At various times, Mr. Curtis served as a manager there. Unfortunately, we are writing you because our review of Mr. Curtis' time working at Good Stuff Eatery has raised serious concerns of *harassment and discrimination based on sexual orientation* prohibited under **Arlington County Code § 31-3 B**, which also constitutes *sex discrimination* prohibited under **Title VII of the Civil Rights Act of 1964**. Additionally, we are aware of violations of food safety and of General Manager Shady Abed's retaliation against Mr. Curtis for bringing said violations to his attention. The violations concerned a potato prep area being located adjacent to a severely damaged, crumbling wall. Mr. Curtis told General Manager Brett Glona and Mr. Abed that particles from the crumbling wall were falling into the hand-cut french fries and thus being consumed by Good Stuff Eatery patrons. Rather than be pleased that Mr. Curtis gave the company an opportunity to correct these issues before a patron became ill and sued, Mr. Abed instead told Mr. Curtis that he would "**cut [Mr. Curtis'] tongue out**" for raising these issues, before subsequently demoting Mr. Curtis from a shift manager to a cashier. In Virginia, while a threat like that does not constitute battery, it still constitutes **civil assault and potentially even criminal assault.** Such retaliation for blowing the whistle on food safety potentially implicates the **Food Safety Modernization Act, 21 U.S.C. § 399d**. Sadly, even though Mr. Curtis notified the Metropolitan Washington Airports Authority (MWAA) police department about Mr. Abed's threat, the MWAA police instead escorted Mr. Curtis from the Good Stuff Eatery premises at Mr. Curtis' behest. **I genuinely believe that had Mr. Curtis not been an openly gay, African-American man, the MWAA would considered Mr. Curtis'**

[1] While OHM Group, LLC, not you, operates the Reagan National Airport, such distinction may be lost on the readers of The Washington Blaze, The Washington Times, and the Washington Post.

**allegations about Mr. Abed's criminal conduct with the seriousness they merited.** On December 27, 2017, OHM fired Mr. Curtis. Mr. Curtis reports recently seeing unfamiliar vehicles parked near his residence. As grave as these concerns are, we prefer a quick and mutually agreeable resolution with OHM and Good Stuff Eatery.

**<u>OHM's leadership retaliated against Mr. Curtis' for notifying them of food safety violations and other violations at the Good Stuff Eatery.</u>**

In either October or November 2017, after a meeting in which staff were asked, "How can we do this at a higher level?" Mr. Curtis told Mr. Abed that a wall in the restaurant was so severely damaged that debris from the wall was falling into the hand-cut french fries, which were prepared near the area below this wall. Mr. Curtis also notified Abed that General Manager Brett Glona was operating the expo station without gloves, thereby touching hand-cut french fries with his bare hands. Mr. Curtis also reported another compliance issue, which was that shift manager Jazmyn Asiamah was not wearing non-slip shoes, as required.

Due to high turnover and resultant understaffing, Mr. Curtis shouldered duties that should have been performed by subordinates, such as working the flat top grill, and porter duties such as washing dishes. Except to post the work schedule, the general manager was rarely present at Good Stuff Eatery. After Mr. Curtis reported the understaffing issues, the general manager was fired and replaced by former general manager Brett Glona. Oddly, the general manager was still somehow clocked in for an entire shift on December 2, 2017. On December 3, 2017, the drawer and cash register that Mr. Curtis frequently uses came up short $30 out of approximately $300. That same day, he was forced to clock out an hour and a half early.

In or around December 14, 2017, Mr. Curtis had to use a day of sick leave to care for his mother; the leave was approved in advance. The following day, December 15, 2017, Mr. Curtis found in an unsecured area accessible to all employees a draft "final, written" reprimand of him alleging that Mr. Curtis had been frequently late to work. Having never received any previous discipline or even a warning about lateness, he called Abed. Abed assured Mr. Curtis that he should not worry, and that Curtis would be "starting over" with a "clean slate."

On December 16, 2017, Abed, who was rarely at the restaurant, showed up and began vigorously preparing food and working at the other various stations.

Later that day, Abed told Mr. Curtis that he was demoting Curtis from shift manager to cashier. Abed promised that he would give Curtis a written letter of demotion. On December 20, 2017, Abed issued Mr. Curtis a letter demoting Mr. Curtis from a shift manager to a cashier. Because Abed permitted Mr. Curtis to make an audio-recording of this meeting, Mr. Curtis has a recording of Mr. Abed's voice in which Abed tells him that he is being demoted to a cashier because Mr. Curtis **<u>made too many complaints</u>.**

On December 22, 2017, **<u>Abed threatened to cut Mr. Curtis' "tongue out"</u>** if Mr. Curtis ever made any accusations against Abed and for reporting the safety and understaffing issues. Mr. Curtis reported Abed's threat to MWAA Police Officer Byers.

On December 23, 2017, about an hour after Mr. Curtis arrived to work, Glona and Abed showed up with MWAA Police, and told Mr. Curtis that *he* was being suspended. They told him to go home, to enjoy Christmas, and that he would return on December 27, 2017 to work, as scheduled, beginning at noon. The MWAA police then escorted Mr. Curtis from the premises.

On December 27, 2017, Mr. Curtis inquired at 10 am about whether he should report to work at noon. At 3 pm, he was told that he was still suspended.

He subsequently received a letter from the OHM head director of operations asserting that a company investigator found Mr. Curtis "guilty" of two counts of disorderly conduct and improper behavior. The letter also stated that Mr. Curtis was "found guilty" for defaming or ridiculing the company. The letter stated that his employment was terminated as a result, and that he would receive his last paycheck on January 8, 2018.

**OHM engaged in unlawful sex and sexual orientation harassment against Mr. Curtis when he worked at the Good Stuff Eatery at the Reagan National Airport.**

Title VII of the Civil Rights Act and the Arlington City Code prohibit unlawful discrimination including harassment based on sexual orientation. As is true in some cases, the basis of the discrimination against Mr. Curtis was directly evidenced through bigoted comments.

On December 20, 2017, District Manager Abed issued Mr. Curtis a letter demoting him from a shift manager ($15/hour) to a cashier ($12/hour). According to the letter, he was being punished for being late six to eight times. For some reason, Mr. Abed also permitted Mr. Curtis to audio-record him. Abed is recorded as stating instead, **"I am demoting you because you complain too much."** Shift manager Jazmyn Asiamah subsequently taunted Mr. Curtis by yelling, loud enough for the other employees to hear, "He is no longer the manager. I don't know why you're thinking you're the manager. You need to empty the front trash now!"

The next day, on December 21, 2017, District Manager Abed told Mr. Curtis, **"You can get your hands dirty or break a nail. You're not a prima donna or a pretty girl."** That same day, shift manager Jazmin Asiamah ridiculed Mr. Curtis, stating, **"Your gay ass does not need to be here. Your ass needs to be terminated. Your pretty ass just sits there. They should have fired you by now."** On knowledge and belief, neither Abed nor Glona has ever disciplined or counseled Asiamah for making these bigoted, hateful statements against Mr. Curtis. Later that day, Mr. Curtis overheard a meeting between Abed, Glona and Asiamah in which Asiamah said about Mr. Curtis, **"He is just a prima donna. I don't see why you're keeping him here."**

The next day, December 22, 2017, Abed told Mr. Curtis that he would cut Mr. Curtis' tongue out if he complained about Abed in any way. Later that day, Mr. Abed told Mr. Curtis that Abed was changing Mr. Curtis' schedule just for the week and that it would change back the next week, but Mr. Curtis' schedule never reverted back.

Six days later, two days after Christmas, OHM fired Mr. Curtis.

**Good Stuff Eatery may still be non-compliant with food safety regulations.**

Mr. Curtis took a photo of the crumbling wall, and after he was fired, he notified the Virginia Department of Health about the issues with the wall. A health inspector visited on December 29, 2017. He gave OHM until January 12, 2017 to fix the wall and to properly clean the potato cutter. While a restaurant is required to clean a potato cutter four times a day, OHM management had instructed the staff to clean it only once a day.

**OHM subjected Mr. Curtis to wage theft.**

Mr. Curtis' last paycheck shows that he worked 91 hours but was only paid for 82 hours. Abed told him that this was because he did not clock out on December 27, 2017. This makes no sense. Mr. Curtis could not have clocked out, because he did not come in, because he was fired.

**The reasons given to justify Mr. Curtis' termination are unconvincing.**

Mr. Curtis was fired in retaliation for raising his concerns about safety and understaffing, and due to bias against him for being an openly gay black man. When Mr. Curtis asked District Manager Abed why he was being demoted, Abed candidly stated, "You complain too much." Abed was certainly referring to Mr. Curtis' complaints about food safety as well as complaints of understaffing. Mr. Curtis was simply and conscientiously raising these concerns as part of his job as the shift manager. Abed's same reasoning about why he demoted Mr. Curtis also explains his decision to terminate Mr. Curtis' employment. They fired him like he was a nothing and a nobody.

Considering the above, it seems apparent that OHM also repeatedly engaged in several forms of discrimination against Mr. Curtis at the Good Stuff Eatery, in violation of, *inter alia*, Title VII of the Civil Rights Act of 1964 and Arlington County Code § 31-3 B, and additionally, that the District Manager Shady Abed engaged in assault, and that OHM violated the Food Safety Modernization Act, 21 U.S.C. § 399d and various health codes. The irony of a hip, modern eatery serving "delicious food" made with "delicious farm fresh ingredients" and serving a burger that honors our "first black president" mistreating an employee for being gay, black and male and for reporting egregious food safety issues, would certainly not be lost on a local jury, or on readers of the Washington Blade, Washington Post or Washington Times. A jury in the Metropolitan Washington D.C. area would probably not consider such conduct to be "**O**utstanding **H**ospitality **M**anagement." In fact, such a jury could very well be positively inclined to award Mr. Curtis punitive damages of six or even seven figures as a way of deterring you from ever again negligently hiring someone as dangerously incompetent in employment relations as Mr. Abed, or from ever discriminating and retaliating against, or harassing, any of your employees like this ever again.

However, Mr. Curtis is not a vengeful person. He wishes to resolve these issues quickly, privately, and to move on with his life. He cannot, however, return to the employ of Goof Stuff Eatery. To sign a confidential settlement agreement and forego legal action, Mr. Curtis requires that you provide him with two years of front pay at his $31,200 per annum shift manager's

salary, and continue of his medical benefits for two years (or until he is next hired, whichever occurs first). Mr. Curtis requires an additional lump sum payment of $100,000 for the impact of the humiliating and intimidating conduct of Mr. Abed and Ms. Asiamah, and for the damage to his professional standing caused by his unwarranted termination from employment. Mr. Curtis requires that you rescind the false and fraudulent "investigation report" issued in support of his termination. He requires that Mr. Abed, any other employees, or their associates, cease circulating around his home. Mr. Curtis also requires that a positive employment reference be provided to prospective employers. Finally, Mr. Curtis requires payment of attorney fees of $5,000.

Mr. Curtis has already filed complaints with the Equal Employment Opportunity Commission and the Arlington Human Rights Commission. He has yet to contact the media, but is unaware of any reason that he should not.

If you care to comply with these requests, Mr. Curtis will permanently forego filing a complaint in D.C. Superior Court and he will execute a confidential settlement agreement. Should you develop any interest in reaching an amicable resolution, e.g., a written settlement of all disputes, please contact me at your earliest convenience. My mobile telephone number (best way to call me) is (202) 246-5645.

Sincerely,

Gerald Gilliard

GERALD L. GILLIARD, ESQ.

cc: OHM Concession Group, LLC
Metropolitan Washington Airport Authority